JANVIER, Judge.
Edward Delaney claims to - have been totally and permanently disabled as the result of a physical injury accidentally sustained on July 15, 1953, while performing his duties in New Orleans as an employee of Lone Star Cement Corporation and that corporation has appealed from a judgment awarding him compensation at $30 per week for a period not in excess of 400 weeks.
Plaintiff alleges that, “while carrying a large piece of iron across a railroad boxcar, he slipped on some oil on the floor and struck a brick wall with the piece of iron which caused your petitioner to be thrown heavily to the pavement on the outside of the boxcar.”
Defendant denies that any such accident occurred and also denies that plaintiff is disabled.
It is admitted that Delaney was an employee of defendant and that his rate of pay was such as to entitle him to the maximum $30 per week if he is entitled to compensation.
The record shows that Delaney had been in the employ of defendant for about eight years and that during that time he had been a regular ánd a competent employee.
The defendant corporation in its operations received gypsum in railroad boxcars and this gypsum was removed from these boxcars and deposited in a hopper, which we understand was a grill covered opening in a platform alongside the track on which the boxcars were brought to the plant for unloading. As each boxcar was placed alongside the platform it was the duty of Delaney and other employees to open the door on that side and then to place in position, from the floor of the car to the platform, a large piece of sheet iron and to nail this iron so that it could not move during the unloading operation from the car over the sheet iron to the hopper in the adjacent platform.
It was Delaney’s duty to “shovel” away from the door of the .car a sufficient amount of gypsum to permit the unloading machine to enter the car. This unloading machine was known as a “scoopmobile” and is referred to by Delaney as a “gyp haul.” This scoopmobile was operated by another employee and when Delaney had shoveled away from the door of the car enough of the gypsum to permit its entry, it would be driven into the boxcar by this other employee; its scoop would pick up a load of gypsum and it would then be driven out to the platform over the sheet iron and would deposit its load of gypsum into the hopper.
In order to obtain more light in the boxcar, it was necessary to open the door on the opposite side of the car and, in order to prevent any of the gypsum from falling out of the door on the other side, it was necessary that there be placed across the door a barrier which consisted of a piece of iron or steel with arms which projected through the door, one against each side of the door frame. These arms prevented this piece of iron from moving.
The gypsum in each boxcar was loaded to a height of only a few feet and this *540 barrier, which is placed across the opposite door, was not required to be very high. Another purpose served by the barrier was to prevent the scoopmobile or gyp haul from being inadvertently driven through the opposite door. Near each end of this barrier was a “hand hold” to be used in placing it in position and in removing it after the car had been unloaded.
Delaney alleges and also testifies that after the car in which he had been working on the day in question was unloaded, he lifted the iron barrier from its position across the door on the far side of the car, and that, as he was carrying it from the car across the sheet iron which extended from the boxcar to the platform, he slipped on. oil which was on the sheet iron and fell .and sustained an injury to his back and that it is as a result of this injury that he is now totally and permanently disabled.
There can be no doubt at all that the story of the accident as told by Delaney (there was no other witness) is far from convincing. He said that no one was with him when he fell and that no one assisted him in removing the iron bar from the door. The record convinces us that it was customary that this barrier be removed by two employees. There were two hand holds for this purpose. If he fell as he says he did, as a result of slipping on the sheet iron, the sheet iron which was nailed to the floor would" have remained in. its position, and the record leaves in our mind grave doubt as to whether this iron was still in its place after the accident occurred.
But more important still is the certainty that, although Delaney spoke to several other employees and doctors later, he did not tell any one of them that he had slipped and had fallen while carrying the piece of iron. All that he said was that his back was hurting him and he asked that he be permitted to 'see á doctor. The fact that his back was hurting him could well have resulted from a condition which was not at all to be attributed to the alleged occurrence and from which he had been suffering for some time.
When plaintiff reported to the foreman of the defendant, he made no reference to a fall and stated that he had been hurt about a week previously when he was “barring” a car. It is explained that sometimes, when a freight car must be moved only a short distance, the employees of defendant will place the end of a crowbar between one of the wheels and a rail of the track and then, by exerting pressure on the other end, force the car to move a very short distance.
We see no necessity to discuss in further detail the evidence as to whether there was such an accident. We ourselves entertain very grave doubt on the subject and yet we cannot say that obviously no such accident occurred. Even the District Judge seems to have had some doubt for he said in his reasons for judgment:
“ * * * Whether Delaney was hurt a few weeks before and again on July 15th, 1953 would make no difference, as in the court’s opinion he would still come under the Workmen’s Compensation Statute. The test is: Was he injured in the course of his employment?”
We interpret this to mean that the District Judge found that there was an accident on July 15th and that even if this accident was not the initial cause of plaintiff’s disability, the condition which already existed was aggravated by that accident. In view of this finding, we feel that the record does not justify a holding that no such accident occurred'.
We find it most difficult to determine just what is plaintiff’s present condition, or what is the injury which causes disability, if there is disability.
Several doctors testified on his behalf that he is totally and permanently disabled and others placed on the stand by the defendant were of the opinion that he is suffering from no disability which was caused by an accident on July 15, 1953, and that he could return to work if he would.
Dr. Louis J. Gehbauer, who was placed on the stand by plaintiff and who first saw him on July 28th, which was 13 days after the accident and who had seen him since *541 on numerous occasions — “15 or 20 times”— says that he is suffering from a “lumbosa-cral sprain and lumbar muscle spasm.” He also says that he-has “hypertrophic arthro-. sis of the lumbar spine” with which however the doctor apparently believed Delaney was suffering before the occurrence. He says that trauma “would aggravate the condition of arthrosis.” He also said that Delaney “was unable to straighten up to an erect position,” and that “he was unable to actually reach down and pick his pants up from the floor.”
Dr. O. L. Pollingue, to whom we shall later refer, said that “ * * * it is rare to find X-rays of a patient over fifty years of age without arthritis,” and when asked whether he meant “hypertrophic arthritis,” he answered, “That’s right.”
Dr. H. Randolph Unsworth, a neurologist, also placed on the stand by plaintiff, examined him on January 27, 1954, which was. a little more -than six months after the occurrence ,of the alleged accident. He found no objective evidence of physical injury, but concluded from the “history” given him that Delaney was suffering from what he termed “post-traumatic hysteria of the conversion type.”
We interpret this as a condition which results when a person who is in an accident and actually sustains no physical injury believes that he has been badly injured. Dr. Unsworth says that after such an occurrence the “psychic” response is such that actual disability results from the fixed belief that an injury has been sustained. He obviously felt that plaintiff' had sustained no actual physical injury as the result of an accident on July 15, 1953, but that Delaney was fully convinced that he had sustained such an injury and that the disabling effect was just as great as though there had been an injury. That he believed that there had been no actual injury is evidenced by his testimony:
“Q. In your examination of him, did you -find anything that would indicate to you affirmatively that the man had an accident on July 15? A. No, sir, you ^re speaking of him physically now ?
“Q. That’s right. A. Well, I suppose not — except what he told me.
“Q:, Well, speaking neurologically ? A. -There’s no way I could be absolutely sure he had an accident July 15. * *
Dr. Unsworth also said that in his “examination of him January 27th, 1954, neurological-ly I found essentially- ho deviation from normal.”
After the plaintiff reported that he was suffering with pain in his back, he was first seen by Dr. B. F. Mancuso, the plant physician of the defendant company. Dr. Mancuso says that he felt the plaintiff’s back but “couldn’t feel anything definite.” He says that the plaintiff “gave no history of having been hit against anything or falling down or anything like that,” but that he “decided to strap his back.”
Dr. Denis H. Groome, an associate of Dr. Mancuso, next saw Delaney and was unable to find any objective symptoms of an injury. He says that Delaney complained so much of pain that he had him sent to the Flint Goodrich Hospital where he could be thoroughly examined by Dr. O. L. Pollingue, an orthopedic specialist. Dr. Pollingue first examined him in the hospital on July 17th, which was the second day after the accident. He says that the X-ray examination made at the hospital showed “a slight lipping of the lumbar vertebrae.” But obviously this condition could not have resulted from the accident two days before, if there was such an accident. The doctor did say, however, that where such a condition is present there are certain maneuvers which would cause pain and certain which would not, but that Delaney complained of pain “on all maneuvers.”
While plaintiff was at the hospital a “corset” was prescribed for him and apparently he has worn it at all times since.
Dr. Pollingue felt that the physical condition of the plaintiff was not .the result *542 of an accident on July 15, 1953, and furthermore he was definitely of the opinion that the plaintiff could "have gone back to work had he been willing to do so. When asked: “Do you believe this man is capable of returning to work as a -laborer for the Lone Star Cement Corporation?” he answered, “If he wanted to-.”
During the trial, Dr. Pollingue undertook to examine Delaney in the presence of the Court, and he explained that there were certain maneuvers which would cause pain if the plaintiff was suffering from the condition of which he complained and certain other maneuvers which would cause no pain at all, and he undertook, by touching him in various spots, to show that the plaintiff whs malingering. After a very short time, however, the District Judge ordered him to stop applying these tests, stating that he would not permit the doctor to “torture” the plaintiff any further.
Dr. Hyman Soboloff, an orthopedic specialist, found no objective symptoms of trauma.
There is testimony of various members of the family of the plaintiff to the effect that until the day of the accident he showed no evidence of pain but that since the accident he has been in constant pain and can never straighten up to an erect position. As against this testimony the medh cal experts placed on the stand by the defendant were of the opinion that if plaintiff was suffering from the-injury of which he complains he would be more comfortable in an erect position than bent over forward as he insists he must be at all times.
Our review of the record has created in our minds grave doubt as to whether plaintiff is actually suffering from the condition of which he complains. However, he was actually present in Court and the District Judge saw him in person and found, from all of the evidence submitted, that he was suffering from such a condition.
According to the testimony of himself and his family he has worn the corset ever since it was prescribed for him. These witnesses also say that though he was in perfect health before the day on which the accident is alleged to have occurred, since that time he has never been able to walk in an erect position and has been in constant pain.
We find ourselves unable to say that the findings of the District Judge were obviously erroneous.
Accordingly, the judgment appealed from is affirmed at the cost of appellant.
Affirmed.